IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION


IN RE:  JOSHUA DARRELL HOLMES,                     Case No. 3:24-bk-10563J
                                                                          (Chapter 7)
              Debtor.

MAI SNOW                                                                        PLAINTIFF

              VS.                          AP No. 3-24-ap-01032

JOSHUA DARRELL HOLMES                                                DEFENDANT


<u>MEMORANDUM OPINION</u>

In this adversary proceeding Mai Snow ("**Ms. Snow**") seeks to have her $100,000.00 claim against her nephew, Joshua Darrell Holmes (the "**Debtor**") determined to be nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) as a debt obtained by false pretenses, false representations, and actual fraud.  She also seeks to have the Debtor's discharge denied for failing to satisfactorily explain a loss or deficiency of assets pursuant to 11 U.S.C. § 727(a)(5).[1] In addition, although not pled in the complaint, the parties also presented evidence and made arguments concerning whether the Debtor's discharge should be denied pursuant to 11 U.S.C. § 727(a)(4)(A) for knowingly and fraudulently making a false oath or account in connection with his bankruptcy case.

A trial was held in Jonesboro, Arkansas, on June 23, 2025.  Ms. Snow was represented by Forrest Stolzer, an attorney with Legal Aid of Arkansas, Inc.  The Debtor was represented by

---

[1] The Complaint also included an action to avoid a transfer from the Debtor to his wife, Tracy Holmes, under 11 U.S.C. § 548(a)(1)(B).  This portion of the Complaint was withdrawn at trial.

Mike DeLoache, with the law firm of Mike DeLoache, P.A.  Ms. Snow and the Debtor were both present and testified, and exhibits were introduced by both parties.  At the conclusion of the trial the Court took the matter under advisement.  The parties have submitted their post-trial briefs, and the matter is ready for disposition.

## I.  Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and (J).  The following shall constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.  The parties consented to this Court entering a final order or judgment in this matter.

## II.  Facts

The only two witnesses called to testify at trial were Ms. Snow and the Debtor.  Ms. Snow testified that she provided $100,000.00 to the Debtor as *a loan* to help him purchase land and a mobile home (the "**Harrisburg Property**").  The Debtor testified that Ms. Snow gave him the $100,000.00 as *a gift* or early inheritance.  Both versions of the testimony are summarized below.

### A.  Ms. Snow's Testimony

At the time of the trial Ms. Snow was 77 years old and living in an apartment in Jonesboro, Arkansas.  Earlier in life she earned a master's degree from the University of Tennessee and retired as a mental health therapist for the Veterans Administration five years ago.  She has income of approximately $3,000.00 a month from social security and a retirement annuity.

Ms. Snow moved to Jonesboro, Arkansas, in 2006 and purchased a home at 3206 Village Cove. She lived there with her adult son, Jay, who had just left the Navy. She and Jay lived there together until he passed away in 2017.

Ms. Snow has eight living siblings and numerous nieces and nephews. One of her brothers is Rickey Holmes, and the Debtor is Rickey's son, her nephew. From the time she moved to Jonesboro in 2006 until Jay's death, she does not recall seeing the Debtor and testified that she did not have a relationship with the Debtor prior to Jay's death. When asked if Jay and the Debtor were friends, Ms. Snow responded that they were cousins, but she would not call them friends. Specifically, she does not recall the Debtor coming to her home to visit Jay but does recall a day that he sat with Jay while he was in hospice the week before he died. After Jay died, the Debtor would occasionally drop by unannounced or call to ask Ms. Snow if she needed anything.

Shortly after Jay's death, Ms. Snow needed a new hot water heater, and the Debtor installed one for her. The Debtor did other jobs around her house such as cutting the shrubs. She paid him in cash and paid him "probably more than [she] would have paid anyone else" for jobs he did. (Tr. at 20).[2]

In 2020, Ms. Snow was diagnosed with diabetic neuropathy and was having trouble walking. She also had other medical issues including back pain, high blood pressure, and high cholesterol. During this time the Debtor rarely came by to check on Ms. Snow, but she did occasionally go by his work to visit and take snacks. She trusted the Debtor and testified she thought at the time they had a close relationship.

---

[2] "Tr." Refers to the transcript of the trial held before this Court on June 23, 2025.

By the Spring of 2022, Ms. Snow was still grieving Jay's death and dealing with her medical issues.  She decided to sell her home because it was too much for her to handle.  When she started talking to the Debtor about selling her home he started visiting her more frequently.  He also started talking about land in Harrisburg, Arkansas, he was interested in buying.  The Debtor told Ms. Snow she could move out there with him and he would help with her medical issues.  He said he would help her remember to take her medications and assist her in getting to her doctor appointments.  At the time the Debtor was living with his wife, Tracy, in her house.

The Debtor kept talking to Ms. Snow about the Harrisburg Property he wanted to buy describing it as "such a good deal" and stating that he just "didn't have the money together" yet. (Tr. at 29).  Ms. Snow described a conversation they had by saying, "he acted like . . . that he needed the money right away."  (Tr. at 100).

On direct examination Ms. Snow described the conversation with the Debtor as having some urgency to it testifying:

A       He made it sound like it was going to be immediate.  He said, "I'm just getting my money together," you know, "but this is available right now."  You know, and it sounded imminent, like he would lose that deal or something, you know.

Q       Okay.

A       And - - and, "This is the property that I really want."

Q       . . . and when he was talking about . . . getting his money together, getting it together from where; did you have any inkling as to that?

A       He had sold some - - the land - - or the trailer that him and his ex-wife had.  He had sold that.  And then - -

Q       Do you believe he got - - did he get any proceeds from that?

A       Yeah.  Yeah, he said he did.

Q       And was there any other source of possible repayment mentioned?

4

> A     No, he acted like he had the money, he was just getting it together, you know. He said, "I'm just getting my money together right now." Yeah. They also mentioned Tracy selling her[] - - house. She had a house that was paid for. And they were blending it together, because they just got married.

(Tr. at 58–59).

> Later in the testimony Ms. Snow testified:

> A     [The Debtor] . . . said if it ever became a situation of - - that I needed help, that he would take care of me, help with that. But, when I decided to sell my house, it was at that time that he said, "Oh, this property has come up," you know, and this would be a great opportunity for him to get this property, you know, but he didn't have the money and he was trying to get his money together. And I don't remember if it was his idea or if I just said that I would loan him the money, but I felt pressured to loan him the money because he willing to help me and he might lose this land deal. It was just pressure. And I wasn't feeling well.

(Tr. at 101–102). So, Ms. Snow told the Debtor she "would go ahead and loan him the money, and he was to pay [her] back as soon as he got his money together." (Tr. at 100).

The Debtor arranged a realtor for Ms. Snow and Ms. Snow, the Debtor, and the realtor met to discuss listing her home for sale. It was listed and was on the market for only a week before it sold for more than the listing price. The home was approximately 1,500 square feet with three bedrooms and a screened-in back porch. The warranty deed dated June 3, 2022, from Ms. Snow to Jim D. Finley reflects a sales price of $212,000.00. Ms. Snow realized $157,946.63 in net sale proceeds after paying off the mortgage and deposited the proceeds in her bank account.

Ms. Snow added the Debtor's name to her bank accounts at some point not reflected by the record. At the time Ms. Snow was having a lot of health issues, and she put him on her accounts so he could pay her bills or write checks for her if she were unable to do it herself. By the time of the trial, she had taken his name off her accounts.

5

After agreeing to provide $100,000.00 to the Debtor and after her house sold, Ms. Snow and the Debtor met at her bank where she had a cashier's check issued in the amount of $100,000.00 made payable to "Joshua Holmes" dated June 6, 2022. She had "the lady at the bank" put the notation "FOR LOAN ON LAND AND TRAILOR [sic]" on the check. (Tr. at 30). Ms. Snow was adamant and consistent in her testimony that the $100,000.00 was a loan to the Debtor not a gift. It was her understanding that the Debtor just needed the loan for a short time to give him a chance to "get his money together" and he would pay the loan back "when he got his money together." (Tr. at 27–28). She testified that "he acted like it wouldn't take him very long." (Tr. at 28). It was also Ms. Snow's understanding that the Debtor intended to put her name on the property saying that would "guarantee" her that she would get her money back. (Tr. at 28). During her rebuttal testimony she stated, "I gave him that loan, and he was to buy the land and the trailer, and he said . . . Now, Aunt Mai, I'm going to put your name on that. Don't you worry about it. You know, I'm going to take [sic] of that." (Tr. at 188). Although she was unclear about the details of how this would happen, she testified that she assumed her name would be taken off the property after she had her money back.

The home Ms. Snow sold in Jonesboro was fully furnished with two bedroom sets, office furniture, an indoor patio set, indoor sofa, glass tables, a patio table and chairs, power tools, Christmas decorations, charcoal grill, and other items. She had a yard sale where she sold some of her clothes, jewelry, and a desk. After her home was sold, Ms. Snow moved into an apartment in Jonesboro for six months. The Debtor moved most of her personal property from her home into a storage unit in Harrisburg, Arkansas. He made several trips using a pickup truck and a trailer. Ms. Snow believed the Debtor had the only key to the storage unit. On a couple of occasions Ms. Snow asked the Debtor for a key to the storage unit, but she was not given a key.

Instead, the Debtor told Ms. Snow that the storage unit was full and things might fall on her head, the door was jammed, and the door was too heavy for her to open.

Three days after receiving the $100,000.00 from Ms. Snow, the Debtor purchased the land and started working on purchasing a mobile home. The Debtor did not visit Ms. Snow often during this time and told Ms. Snow it was because he was busy arranging for the mobile home to be purchased and moved onto the land.

A document titled, "Cash Gift Letter" was introduced into evidence by Ms. Snow. The document, on 21st Mortgage Corporation ("**21st Mortgage**") letterhead, purports to be a statement by Ms. Snow that she made a gift of $100,000.00 to Josh Holmes, her nephew, from her personal checking account (the "**Gift Letter**"). The Gift Letter is dated June 29, 2022, and reflects Ms. Snow as the donor with her address being the apartment she was living in at the time in Jonesboro.

Ms. Snow stated that she did not sign the document and had not seen the document until the trial. She further testified that the Debtor did not bring the Gift Letter to her to sign, did not ask her to sign the Gift Letter, and the signature on the Gift Letter was not her signature. Ms. Snow also stated that even if he had asked her to sign it, she would not have signed the Gift Letter because the $100,000.00 was not a gift. During rebuttal Ms. Snow was adamant that she never signed the Gift Letter and knew nothing about it.

The Debtor's loan with 21st Mortgage was approved and the Debtor and his wife, Tracy, purchased a mobile home with the assistance of the $100,000.00 from Ms. Snow. When her six-month lease expired on the Jonesboro apartment, Ms. Snow moved onto the Harrisburg Property. Five people were living in the mobile home: The Debtor, his wife Tracy, Ms. Snow, the Debtor's

son, and Tracy's son.  Ms. Snow had her own bedroom but shared her bathroom with others.  She lived there for only five months before moving back into an apartment in Jonesboro.

Right before Ms. Snow moved into the Harrisburg Property, the Debtor told her "he didn't know how he was going to make the payments" on the mortgage because the payment and the utilities were so expensive.  (Tr. at 41).  She told the Debtor she would help him with the house payment.  Three checks were introduced dated November 28, 2022; December 29, 2022; and January 26, 2023, all in the amount of $610.00 and all with a notation on the memo line "house payment."  (Pl.'s Ex. 15).  Ms. Snow acknowledged that the signatures on the three checks were her signatures.  She explained that $500.00 was to help with the house payment, part was for the phone bill, and the rest was for the rent on the storage unit where her property was stored.  There were also payments made for February and March.  She did not have any expectation that the Debtor would repay her for the contributions she made to help with the mortgage payment.

After she moved onto the Harrisburg Property, the Debtor told her he wanted to build a few additions onto the mobile home, and Ms. Snow agreed to pay to build a porch.  She paid around $11,000.00 for the materials; however, the work was not completed when she moved out in February 2023.  There was no discussion about the Debtor repaying Ms. Snow for these improvements because at the time she paid for the materials she did so with the understanding she would be living there.

The Debtor worked in a warehouse during the day and after work repaired cars, trucks and other vehicles on land around the mobile home.  It was Ms. Snow's belief that the Debtor had income from the work he performed at night and on weekends repairing vehicles.  He told Ms. Snow that "he actually made more money working the other jobs" than he did at his regular

employment.  (Tr. at 45).  He said he "sold cars, worked on cars, worked on lawnmowers, worked on motorcycles, and bought and sold lawnmowers."  (Tr. at 45).  He also told her that he kept money in a safe in the closet of his bedroom.

Soon after moving onto the Harrisburg Property, Ms. Snow began doubting everything the Debtor had told her.  Neither the Debtor nor Tracy helped her with her doctor appointments.  She only remembers one time when she came in after church that there was a family meal, but there were very few family meals there.  Everyone was responsible for their own meals and cleanup.  She only cooked one meal while living in the mobile home.  Typically, she bought food out while going back and forth to doctor or therapy appointments.  She described the atmosphere at the Harrisburg Property as "toxic" and said there was yelling, screaming, name calling, and cursing, so she stayed in her room most of the time.

Ms. Snow moved out of the Harrisburg Property in February 2023.  Ms. Snow explained that her brother, Rickey (the Debtor's father) was being released from prison and the Debtor and Tracy told her Rickey would be moving into the Harrisburg Property.  The way this message was presented to her she thought Rickey would be moving in right away.  Since there were no rooms available for Rickey, Ms. Snow understood this to mean that she needed to move out to make room for Rickey.  Even though Rickey is her brother, she described her relationship with him as nonexistent.

Before moving out, Ms. Snow obtained a key to the storage unit in Harrisburg from the Debtor and had her property moved to a storage unit in Jonesboro.  Instead of the storage unit being full, it was only about half full and a lot of Ms. Snow's property was not there.  She moved into an apartment in Jonesboro.

After she moved out, the Debtor sent Ms. Snow a text message saying she did not have to move out because Rickey was coming to live with them, adding that he planned to build him a place to live on the property.  Ms. Snow testified that she did not move out because Rickey was moving in, she moved out because the way the Debtor and Tracy told her he was moving in indicated to her they wanted her out.  She did not tell them in advance that she intended to move out because she was afraid they would threaten her somehow.  This belief stemmed from an incident the Debtor and Tracy had told her about with Rickey's wife when he went to prison.  They laughed about taking things out of the house and threatening her if she did not leave.

When asked about any previous loans to the Debtor, Ms. Snow recalled loaning the Debtor money two times before the $100,000.00 loan.  The first time was for him to pay his divorce attorney.  The second time had to do with the sale of land involving his ex-wife.  Ms. Snow testified she was not sure of the dates of the loans, but they were possibly in 2021 or 2022.  Both times she loaned the Debtor $1,500.00, and both times he repaid the money.

On April 10, 2023, Ms. Snow, represented by Scott Troutt, initiated a lawsuit against the Debtor in Poinsett County, Arkansas.  The complaint alleged that Ms. Snow loaned the Debtor and Tracy $100,000.00, "interest free, for the down payment so they could obtain a bank loan to purchase the property."  (Def.'s Ex. 1, at ¶ 7).  The complaint also alleged that Ms. Snow was paying monthly rent "because her residing in the home was not part of their oral loan agreement."  (Def.'s Ex. 1, at ¶ 14).  There was no allegation of fraud in the complaint.

The complaint also alleged that the Debtor had possession of some of Ms. Snow's property, including:  "A washer and dryer, an indoor patio furniture set, a home computer, a printer, a black metal patio table, a glass top large patio table, three (3) black patio love seats with cushions, four (4) bird houses, cushions to the wicker furniture, sofa cushions, a China

cabinet, four (4) lamps, a living room coffee table, a Ducks Unlimited gun case, a set of Christmas village collectables with a large black display table, four (4) gray barstools, one (1) black bar stool, and a snow babies collection."  (Pl.'s Ex. 1, at ¶ 24).

A trial was scheduled for February 5, 2024.  Before the trial began, the parties settled by the Debtor agreeing that he owed Ms. Snow the $100,000.00 and agreeing to make monthly payments on the loan.  He also agreed to give her personal property back.  Due to the settlement, the trial was cancelled, and Mr. Troutt was to prepare an agreed order to present to the judge. Before the settlement was reduced to writing, the Debtor filed his bankruptcy petition, and the order was never entered.

Although the Debtor agreed to return her property, Ms. Snow testified at the trial that she still had not received the indoor patio furniture set, the home computer, the printer, the black metal patio table, the glass top large patio table, and the black patio love seat with the cushions. She was also still missing some things of sentimental value such as bird houses made from Jay's license plates, her Christmas villages, and the snow babies.

Ms. Snow returned to the stand for rebuttal and was adamant that the $100,000.00 she loaned to the Debtor was not an early inheritance and there had been no discussions about it being an early inheritance.  She stated that she sold her house because she could no longer take care of it and needed the money for her retirement.

### B.  The Debtor's Testimony

The Debtor testified on his own behalf.  He has a ninth-grade education, works in a warehouse full-time, and repairs cars, motorcycles and other equipment in his spare time.  He described himself as a shade tree mechanic and admitted helping friends by repairing their cars and motorcycles but denied ever receiving any income from doing so.

Contrary to Ms. Snow's testimony, the Debtor testified that he did visit Jay at Ms. Snow's home.  He also recalled staying with Jay one day when he was in hospice.  At the time Jay died, the Debtor described his relationship with Jay as a close one.

As to the Debtor's relationship with Ms. Snow, the Debtor testified that Ms. Snow was more like a mother to him than an aunt.  He described the relationship as one where she would come by his work to visit with him and bring him snacks.  He did replace her hot water heater and microwave, pressure washed her house and driveway, cut hedges, and even hung Christmas lights for her.  He denied receiving any money from Ms. Snow for the things he did.

There was testimony about Ms. Snow's decision to sell her home.  The Debtor asked Ms. Snow numerous times if she was sure she wanted to sell her home, and he testified that she told him yes that "it was too much for her [to] take care of, and if it didn't work out with [him], she would just stay in the apartment that she had rented in Jonesboro."  (Tr. at 160–61).

After selling her home, Ms. Snow lived in an apartment in Jonesboro for six months.  The Debtor moved some of her things to the apartment and rented a storage unit in Harrisburg for some of her other property.  The Debtor admitted that the storage unit was full of her property.  Contrary to Ms. Snow's testimony, the Debtor said both he and Ms. Snow had keys to the storage unit.  Contradicting his own testimony that she already had a key to the storage unit, he admitted when she asked about the key he told her the unit was full because he did not want her to hurt herself trying to open it.

The Debtor explained that not all her property was put in the storage unit.  There were six storage sheds on the Harrisburg Property, and some of Ms. Snow's property was moved into a wooden shed on the Harrisburg Property.  The Debtor testified that the shed was broken into while they were completing the loan process for the mobile home, and some things were stolen,

but no police report was filed.  This happened within a couple of months of the Debtor buying

the land.  In addition to the six sheds, there was also a house on the property that had burned and

some of her things were in the burned house.

The Debtor was asked about the $100,000.00 cashier's check.  He admitted he met Ms.

Snow at the bank where she handed him the cashier's check for $100,000.00.  He acknowledged

at trial there was a notation on the cashier's check that read "FOR LOAN ON LAND AND

TRAILOR [sic]" but said he did not look at the check at the bank.

After receiving the $100,000.00 on June 6, 2022, the Debtor bought the 3.8 acres of land

for $30,000.00 and began working with 21st Mortgage to purchase and finance the mobile home.

The Debtor testified that 21st Mortgage told him that he would be unable to finance the purchase

of the mobile home with the $100,000.00 showing up as a loan and he would need to explain the

source of the funds.  21st Mortgage gave him the blank Gift Letter and told the Debtor he would

need to have Ms. Snow sign it.

According to his testimony, when 21st Mortgage raised the issue about the notation on

the check, "at first, [he] thought it was for a loan."  (Tr. at 161).  He testified that he called Ms.

Snow to let her know he was coming over and explained what was going on.  It was the Debtor's

testimony that when he asked Ms. Snow about the notation, she said the reason for the notation

was to protect him from his new wife.  According to the Debtor, Ms. Snow told him to bring the

Gift Letter form to her and she would take care of it.  The Debtor testified that his wife Tracy

filled out the form except for Ms. Snow's signature, and he took the Gift Letter to Ms. Snow for

her to sign.

Contrary to Ms. Snow's testimony that she did not sign the Gift Letter, the Debtor

testified that he physically carried the Gift Letter to Ms. Snow's apartment and actually saw her

sign the Gift Letter.  The signature on the Gift Letter and the signatures on the checks introduced into evidence earlier do not look the same.  The Debtor offered the explanation that Ms. Snow sometimes has tremors that make her hands shake.

Although Ms. Snow was adamant that the $100,000.00 was a loan and not a gift, the Debtor said he believed the transfer was a gift.  He explained that after Jay died, he believed Rickey was Ms. Snow's sole beneficiary.  After Rickey got in trouble with drugs and served time in prison, he believed Ms. Snow changed her beneficiary to "Uncle Tom" and then later changed her beneficiary again to make himself her sole beneficiary.  The Debtor said he was her sole beneficiary because Ms. Snow wanted to take care of him since his dad, Rickey, probably would not be able to take care of him.

The Debtor called the $100,000.00 "an early inheritance."  He recalled a conversation he had with Ms. Snow around the time he and his wife were looking for land to purchase.  Ms. Snow started discussing her health and asked how he would feel about her living with him.  According to the Debtor when she was talking about selling her home she said:

> So, why don't I just go ahead and take care of it now, and that's something less that you have to take care of once I pass away.  And then, I'll go ahead and give you, you know, an early inheritance, is what she called it.

(Tr. at 160).

Contrary to the Debtor's testimony, Ms. Snow, during her rebuttal testimony, admitted there may have been a discussion about her inheritance with her brother Tom, but there was not a discussion about leaving everything to the Debtor and not a discussion about an early inheritance.  She also denied ever thinking about leaving her home to her brother, Rickey, or naming him as her beneficiary.

After the mobile home loan was approved, a $40,000.00 down payment was made on the mobile home.  Tracy was a co-buyer on the 21st Mortgage loan for credit purposes so her name was on the title to the property.  The Debtor stated that Tracy was also included on the deed to the land because she was his wife.  Ms. Snow's name was not included on the deed to the land. The Debtor denied ever telling Ms. Snow that her name would be on the deed to guarantee repayment of the loan.

 Ms. Snow did move into the mobile home and the Debtor thought she would stay there until she died.  There were conflicts between Ms. Snow and Tracy.  He described his wife as an "OCD freak" for cleanliness and described Ms. Snow's method of cleaning dishes as unacceptable to Tracy.  He admitted there were other disagreements between Ms. Snow and his family while Ms. Snow was living with them.

When asked about Ms. Snow's testimony that he and Tracy were going to take care of her, the Debtor admitted that he told Ms. Snow that he would take care of her as long as she lived and told her he would never put her in a nursing home.  It was also the Debtor's testimony, however, that he did not tell Ms. Snow that he would help her with doctor appointments or other medical needs.  In fact, he admitted he did not take her to any doctor appointments and said he would not have told her he would help with doctor appointments or medical needs because his work schedule would prevent him from doing so.

When asked about Ms. Snow moving out of the Harrisburg Property, the Debtor denied there was any type of threat made against Ms. Snow.  He did describe a conversation he and Tracy had with Rickey's wife when he went back to prison.  Rickey's wife was still living in the house Rickey was buying from his brother, Don.  The Debtor and Tracy went to Rickey's house

and told her she either had to bring the payments current or leave because the landlord would be selling the property.

He also admitted that Rickey was going to move into the Harrisburg Property and the night before Ms. Snow moved out, he was moving the last of Rickey's property onto the Harrisburg Property.

As to the state court action, the Debtor recalled being at the courthouse with his attorney, Ms. Snow, and her attorney. He testified that his counsel had a copy of the Gift Letter but advised him to agree to pay the $100,000.00 back. When asked why he would agree to pay the $100,000.00 back when he had the Gift Letter saying the money was a gift he responded, "Because my lawyer told me that was the best thing to do." (Tr. at 115). The Debtor was not presented anything to sign regarding the agreement to pay back the $100,000.00 until after the bankruptcy was filed, so the agreement was never signed. He recalled he was going to make payments of $250.00 per month to Ms. Snow under the agreement, and although he testified that he intended to pay the money back, he also testified that he told his attorney that he could not afford to pay it back but he would try. He did not recall agreeing to pay Ms. Snow's attorney fees. The bankruptcy petition was filed seventeen days after the parties agreed to settle the state court action, again on advice of counsel.

As to other loans, the Debtor admitted that Ms. Snow gave him a loan of $1,500.00 when he was going through his divorce, and he paid that money back as soon as he could.

The Debtor was also examined about his bankruptcy proceeding. He admitted he went over his petition and schedules with his attorney, believed to the best of his knowledge everything was true and correct, and signed the schedules under penalty of perjury.

16

The Debtor listed the Harrisburg Property in his Schedule A/B as located at 3691 Highway 163, Harrisburg, Arkansas, and described it as a "residence & 3.08 acres." The value of the Harrisburg Property was listed as $186,100.00. The Debtor listed 21st Mortgage as a secured creditor on Schedule D with a claim in the amount of $132,886.00 secured by the Harrisburg Property. The Debtor reaffirmed the debt to 21st Mortgage in the amount of $130,754.15.

The Debtor listed Ms. Snow as an unsecured creditor with a civil judgment in the amount of $100,000.00. The claim is not listed as disputed, unliquidated, or contingent. No where in the schedules or in the Statement of Financial Affairs (the "**SOFA**") is the $100,000.00 transfer reflected as a gift.

In his SOFA, the Debtor listed $42,031.61 in gross income for 2023, and stated he did not receive any other income during this year or the two previous calendar years. However, his Schedule I reflects monthly child support payments of $290.00.

In response to Question No. 18 on the SOFA, "Within 2 years before you filed for bankruptcy, did you sell, trade, or otherwise transfer any property to anyone, other than property transferred in the ordinary course of business or financial affairs?" the Debtor originally disclosed one transfer – a 2003 Jeep Wrangler to an unknown buyer in 2023 for $3,000.00 and this same entry is in the amended SOFA filed a few days before the trial. He testified that this entry was incorrect because he did not receive $3,000.00 for the sale of the 2003 Jeep Wrangler but instead traded the 2003 Jeep Wrangler for a 2009 Dodge Ram.

In his amended SOFA filed a few days before the trial, the Debtor added the sale of a 2016 Dodge Ram. In June 2022, in order to qualify for the loan with 21st Mortgage, the Debtor paid $15,707.28 to Capital One Auto to pay off the loan on the 2016 Dodge Ram. The SOFA

reflects the sale of the 2016 Dodge Ram to Bayird Preowned Supercenter for $13,000.00 on April 20, 2023.

An exhibit was introduced that contained several transfers that were not on the SOFA. The Debtor admitted the transfers were left off the original SOFA and after being asked about the sale of the 2016 Dodge Ram, he provided the trustee with a written explanation of various transfers. It seemed from the testimony that the Debtor believed he had complied with disclosure of the transfers by providing this written explanation to the trustee. The exhibit explained that the $13,000.00 received from the sale of the 2016 Dodge Ram was used to pay his state court attorney, to pay bills, and to purchase a Ford Ranger. The exhibit continued by explaining the sale of the Ford Ranger, the purchase and trade of a 2003 Chevy 1500, the purchase and trade of a 2003 Jeep Wrangler, and the purchase of a 2009 Dodge Ram. When the 2009 Dodge Ram was purchased, Tracy was using the 2018 Chevy Malibu and needed a truck for her business, so the Debtor and Tracy traded vehicles.

In response to Question No. 23 of the SOFA, "Do you hold or control any property that someone else owns?" the Debtor listed numerous pieces of property stored on the Harrisburg Property for Tracy Holmes (wife), AJ Snyder (stepson), Holmes Inflatables LLC (wife's business), Alexis Quirrels (stepdaughter), Engines, Inc., Rickey Holmes (father), Jordan Holmes (son), Jonathan Webb, and Mai Snow. The property listed for Ms. Snow was valued at $575.00 and included "(2) metal benches, glass top table, (5) stools, washer/dryer, table, lamps, china cabinet, and 6-pc wicker patio furniture set." Several photos were introduced into evidence of lawnmowers, vehicles, SUVs, go-carts, and an air compressor, and the Debtor identified most of the property as belonging to his father or other relatives. He admitted that there was a side-by-side on the property at one time, but it belonged to his brother who let him use it.

The Debtor attended his first meeting of creditors and was examined under oath. When asked about the $100,000.00 transfer by the trustee, the Debtor told him it was a loan. When asked at trial why he said it was a loan and not a gift he responded because that is what he agreed to in the state court action.

### III. Arguments

#### A.   11 U.S.C. § 523(a)(2)(A)

Ms. Snow argues the debt owed to her by the Debtor was obtained by false pretenses, false representations, and actual fraud. She believes the Debtor induced her to loan him $100,000.00 from the proceeds of the sale of her home with no intention of repaying the loan by making false representations including that he was trying to get his own money together, that her name would be on the deed to the land to guarantee she would be repaid, and that she would be taken care of by him. She alleges that the Debtor took advantage of their relationship and of her "vulnerability due to age, isolation, loneliness, and bereavement." (Compl. ¶ 23).

She further argues that the Debtor acknowledged the $100,000.00 transfer was a loan and agreed to repay her on the day the state court trial was scheduled to be held, even though he had the Gift Letter in his possession at the courthouse saying it was a gift. In addition, she argues that he listed her as an unsecured creditor with a claim of $100,000.00 with no notation that the claim was disputed or contingent and testified at his first meeting of creditors that the $100,000.00 transfer was a loan, not a gift.

The Debtor argues there was never a loan. Instead, he argues the $100,000.00 was given to him by Ms. Snow as a gift or an early inheritance. He argues Ms. Snow moved to the Harrisburg Property to live with him and his family intending to stay until she died but later decided to move out and that is when she decided to ask for her money back. He also points out

that although Ms. Snow is alleging false representations and fraud in this adversary proceeding, she did not include any allegations of fraud in the state court action.

In his post-trial reply brief, the Debtor argues the Arkansas statute of frauds bars enforcement of oral agreements involving an interest in land and agreements that are not performable within one year.  The Debtor asserts that he did not sign any document acknowledging a debt.  He further argues that if he had promised to put Ms. Snow on the deed to the land she would have participated in the closing, objected to her name not being on the deed, reduced the agreement to writing, and refused to pay rent until she was shown a deed.  She did none of these things.

**B.  11 U.S.C. § 727(a)(5)**

Ms. Snow alleged in the complaint that the Debtor has not accounted for how the funds from the $100,000.00 transfer were used and his failure to explain the disposition of these funds supports denial of his discharge under 11 U.S.C. § 727(a)(5).  This argument was abandoned by Ms. Snow in her post-trial brief and for that reason will be dismissed without further discussion.

**C.  11 U.S.C. § 727(a)(4)(A)**

Although the complaint did not allege a cause of action under Section 727(a)(4)(A), evidence on this issue was introduced without objection.  In addition, the Debtor presented arguments in defense of the Section 727(a)(4)(A) allegations in his post-trial brief.

Ms. Snow alleges that the Debtor's discharge should be denied pursuant to 11 U.S.C. § 727(a)(4)(A) for making false oaths in connection with the bankruptcy case.  Ms. Snow argues in her post-trial brief that the Debtor made several false oaths in his bankruptcy schedules that were never corrected even though the Debtor was aware the statements were false.

The Debtor argues he disclosed all his assets and transactions in his schedules and any minor inaccuracies were immaterial and promptly corrected.  In addition, the Debtor has cooperated with the trustee and provided the trustee with a list of all transactions not on his schedules.

## IV.  Discussion

At the trial in this adversary proceeding, Ms. Snow testified on her own behalf and was an exceptionally credible witness.  She is well educated and articulate.  She listened thoughtfully to the questions and was impressive in her ability to answer each question precisely, even when asked more than one question at a time.  Her ability to recall events seemed very genuine, and she was as quick to state that she did not remember a particular event as she was to describe an event in detail.  Her demeanor on the stand and the way she spoke with clarity and authority demonstrated the truthfulness of her statements.  Her testimony was also not only believable and credible but was supported by other evidence.

In stark contrast to Ms. Snow's credibility, the Debtor was not credible.  His demeanor and manner on the stand suggested he was fabricating his story as he testified.  In fact, the Court believes a lot of the Debtor's testimony was untruthful, in particular the testimony concerning the signature on the Gift Letter.  In addition, more than once, his own testimony contradicted itself.

Based on these credibility findings, the testimony given at trial, the exhibits introduced into evidence, and the arguments of counsel, the Court will discuss each of the causes of action below.

### A.  11 U.S.C. § 523(a)(2)(A)

Ms. Snow's dischargeability cause of action is brought under 11 U.S.C. § 523(a)(2)(A), which provides that a discharge under Section 727 does not discharge an individual debtor from

any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A).

Generally, to succeed in having a debt excepted from discharge under Section 523(a)(2)(A) for false pretenses or a false representation the creditor must prove that "(1) the debtor made a representation, (2) with knowledge of its falsity, (3) deliberately for the purpose of deceiving the creditor, (4) who justifiably relied on the representation, which (5) proximately caused the creditor damage." *Heide v. Juve (In re Juve)*, 761 F.3d 847, 851 (8th Cir. 2014) (quoting *Treadwell v. Glenstone Lodge, Inc. (In re Treadwell)*, 637 F.3d 855, 860 (8th Cir. 2011)).

"Actual fraud" was added to Section 523(a)(2)(A) by Congress in 1978.[3]  Significantly, the Supreme Court has held that actual fraud can be a basis for denying the dischargeability of a debt without a representation being made and without justifiable reliance on the part of the creditor.  *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 362–66 (2016).

> "Actual fraud" has two parts: actual and fraud.  The word "actual" has a simple meaning in the context of common-law fraud:  It denotes any fraud that "involve[es] moral turpitude or intentional wrong." *Neal v. Clark*, 95 U.S. 704, 709, 24 L. Ed. 586 (1878).  "Actual" fraud stands in contrast to "implied" fraud or fraud "in law," which describe acts of deception that "may exist without the imputation of bad faith or immorality." *Ibid.*  Thus, anything that counts as "fraud" and is done with wrongful intent is "actual fraud."

*Id.* at 360.

The creditor bears the burden of proving these elements by a preponderance of the evidence.  *See Grogan v. Garner*, 498 U.S. 279, 286–87 (1991).

> [I]n determining whether a particular debt falls within the ambit of an exception to discharge under 11 U.S.C. § 523, it was the intention of Congress that the statute should be construed liberally in favor of the debtor and strictly against the objecting

---

[3] Actual fraud was added "as an alternative ground for excepting a debt from discharge" when Congress "enacted the Bankruptcy Code in 1978." *All Star Collision, LLC v. Scott (In re Scott)*, AP No. 25-04008-357, 2025 WL 2553848, at *2 (Bankr. E.D. Mo. Sep. 4, 2025) (citing *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 359 (2016)).

creditor in order to effectuate the fresh start principles which pervade the entire bankruptcy system.

*Ramsey Nat'l Bank & Tr. Co. v. Dammen (In re Dammen)*, 167 B.R. 545, 549 (Bankr. D.N.D. 1994) (first citing *Gleason v. Thaw*, 236 U.S. 558, 562 (1915); then citing *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1287 (8th Cir. 1987); and then citing 3 *Collier on Bankruptcy* ¶ 523.05A, at 523-19 (15th ed. 1993)).  If an objecting plaintiff fails to prove any one element, the indebtedness in question is entirely dischargeable.  *Lindau v. Nelson (In re Nelson)*, 357 B.R. 508, 513 (B.A.P. 8th Cir. 2006).

The Court will discuss each of the five elements enumerated above followed by a separate discussion of actual fraud.

### *(1) Did the Debtor make a representation?*

The analysis of the first element varies depending on the cause of action asserted.  Where the cause of action asserted is false pretenses, the first element is met when there is an "implied misrepresentation or conduct intended to create and foster a false impression."  *Sheri J. Palmer Revocable Tr. v. Stephens (In re Stephens)*, AP No. A21-4023, 2022 WL 17587184, at *2 (Bankr. D. Neb. Dec. 12, 2022) (quoting *Merchs. Nat'l Bank v. Moen (In re Moen)*, 238 B.R. 785, 791 (B.A.P. 8th Cir. 1999)).  False pretenses are shown "when the circumstances imply a particular set of facts, and one party knows the facts to be otherwise'" and fails to correct what would otherwise be a false impression.  *Moen*, 238 B.R. at 791 (quoting *Trizna & Lepri v. Malcolm (In re Malcolm)*, 145 B.R. 259, 263 (Bankr. N.D. Ill. 1992)).  The debtor's "silence as to a fact material to his debt obligation to a creditor" can also satisfy the first element for a cause of action under false pretenses.  *Q.C. Fin. Servs., Inc. v. Beza (In re Beza)*, 310 B.R. 432, 437 (Bankr. W.D. Mo. 2004) (citing *Check Control, Inc. v. Anderson (In re Anderson)*, 181 B.R. 943, 950 (Bankr. D. Minn. 1995)).

When the cause of action asserted is false representation, the first element is met by an express representation that is false at the time made. *See CNA Fin. Corp. v. Flood (In re Flood)*, 498 B.R. 806, 811 (Bankr. S.D. Ohio 2013) (citing *Beverly Enters. v. Eversole (In re Eversole)*, 110 B.R. 318, 324 (Bankr. S.D. Ohio 1990)); *Galvin v. Cole (In re Cole)*, 164 B.R. 947, 949 (Bankr. N.D. Ohio 1993). "Even if a false statement is made, no fraud exists unless the maker knows the statement is false at the time the statement is made." *Nelson*, 357 B.R. at 513. "A promise to pay a debt in the future does not constitute a misrepresentation simply because the debtor fail[s] to pay." *Palmer Revocable Tr.*, 2022 WL 17587184, at *2. Such a promise can be a false representation, however, if at the time the representation is made the debtor has no intention to make the future payment. *Id.* (citing *Shea v. Shea (In re Shea)*, 221 B.R. 491, 497 (Bankr. D. Minn. 1998)).

The Debtor's representations began shortly after Ms. Snow started talking about selling her home. Ms. Snow testified that she decided to sell her home because it was too much for her to continue to take care of due to her age and various medical issues. Her modest income of approximately $3,000.00 a month consisted of social security and a small pension annuity. Ms. Snow testified that she needed the money from the sale of her home for retirement. When the Debtor learned of Ms. Snow's intention to sell her home, he started telling her about the land he was interested in buying.

The Debtor made three primary representations to Ms. Snow. First, he represented to Ms. Snow that he was getting his money together and just needed her money until he could get it together to repay her. He had told her he was selling property he had owned with his ex-wife and mentioned Tracy selling her house, giving Ms. Snow the impression that he would be receiving money from these sales. Based on these circumstances and representations, Ms. Snow testified

that she "assumed they had money in the first place" and it would be available in a short time. He created a sense of urgency in getting the money so he would not lose the opportunity to purchase the land he wanted to buy.  The testimony supports a finding that Ms. Snow believed the loan would be repaid in a matter of a few months.

The second representation was that he would put Ms. Snow's name on the land and trailer to guarantee she would receive her money back saying to her, "Now, Aunt Mai, I'm going to put your name on that.  Don't you worry about it."  Finally, the Debtor assured Ms. Snow that he would take care of her by helping her remember her medicine and getting her to her doctor appointments.

In making these representations, Ms. Snow testified that the Debtor created a sense of urgency about needing the money and Ms. Snow felt pressured to help him and loan him the money.  Based on these facts, the Court finds that Ms. Snow has met her burden of proving the first element, that the Debtor made representations.

### (2)  Were the representations made with knowledge of their falsity?

The second element for the Court to consider is whether the Debtor knew the representations he made to Ms. Snow were false at the time he made them.

As to the first representation that the Debtor was getting his money together and needed to borrow the $100,000.00 from her for just a short time, no evidence was introduced that even suggested the Debtor could be "getting together" $100,000.00 from any source to enable him to repay Ms. Snow within a short time.  In fact, the evidence was to the contrary.  Without the loan from Ms. Snow the Debtor would not have been able to purchase the land and mobile home.  His gross annual income from his full-time employment with Engines, Inc., in 2022 was only $36,361.34.  Although there was testimony that he was selling property he still owned with his

ex-wife, no evidence was introduced to support this as a source of funds for him to repay Ms. Snow. Similarly, although his wife, Tracy, sold her home, none of the sale proceeds were used for the Harrisburg Property, and there was no evidence that the sale proceeds were intended to be given to Ms. Snow to repay the $100,000.00 loan.

Ms. Snow met her burden of proving that when the Debtor told her he was getting his money together and just needed the loan until then, leaving her with the impression that he had the money (or assets to liquidate) and just needed to get it together to pay her back in a short amount of time, the Debtor knew these statements were false. He made these statements knowing he was not going to receive $100,000.00 from the sale of the property he owned with his ex-wife and no evidence was introduced to support a finding that he believed any of the sale proceeds from Tracy's home would be used to repay Ms. Snow. The Debtor was knowingly making an implied misrepresentation of his ability to repay Ms. Snow in short order, and he failed to correct the false impression. The Debtor knew his misrepresentations were giving Ms. Snow an impression that was not accurate and he failed to correct the false impression. The representations were not true, and the Court finds that the Debtor made the representations to Ms. Snow knowing the representations were false.

As to the second representation that the Debtor would put Ms. Snow's name on the deed to the property to guarantee repayment of the loan, the Debtor made the statement as a further inducement to persuade Ms. Snow to loan him the money. The Debtor's own admission that he never intended to put Ms. Snow on the deed to the property clearly supports a finding that when this statement was made he knew it was false. This misrepresentation also left Ms. Snow with the false impression that the Debtor intended to protect her from not receiving her money back, and the Debtor did nothing to correct this false impression.

As to the third representation, that he would take care of Ms. Snow the rest of her life, help her remember her medicine, and help her get to doctor appointments, the record does not support a finding that the Debtor knew these statements were false at the time they were made. Although the Debtor did not follow through on his promises, from viewing the evidence as a whole, the Court does not believe the Debtor made these statements knowing they were false at the time made.

Based on the foregoing, Ms. Snow has met her burden of proving the second element that the Debtor made representations with knowledge that the representations were false at the time made.

### (3)  Were the misrepresentations made deliberately to deceive Ms. Snow?

The third element the Court must consider is whether the Debtor made the misrepresentations deliberately for the purpose of deceiving Ms. Snow.  "In order for the debt to be excepted from [the Debtor's] discharge pursuant to § 523(a)(2)(A), [the Debtor] must have knowingly made the misrepresentations or conveyed a false impression with the particular intent to deceive [Ms. Snow]." *Minn. Client Sec. Bd. v. Wyant (In re Wyant)*, 236 B.R. 684, 698 (Bankr. D. Minn. 1999).  The requisite intent requires a "showing of an intent to induce the creditor to rely and act on the misrepresentations in question." *Moen*, 238 B.R. at 791 (quoting *Moodie-Yannotti v. Swan (In re Swan)*, 156 B.R. 618, 623 n.6 (Bankr. D. Minn. 1993)).  "Because direct proof of intent (*i.e.,* the debtor's state of mind) is nearly impossible to obtain, the creditor may present evidence of the surrounding circumstances from which intent may be inferred." *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1287 (8th Cir. 1987) (citing *Webster City Prod. Credit Ass'n v. Simpson (In re Simpson)*, 29 B.R. 202, 211 (Bankr. N.D. Iowa 1983)).  "When the creditor introduces circumstantial evidence proving the debtor's intent to deceive, the debtor

'cannot overcome [that] inference with an unsupported assertion of honest intent.'" *Id.* (quoting *Simpson*, 29 B.R. at 211–12). "The focus is, then, on whether the debtor's actions 'appear so inconsistent with [his] self-serving statement of intent that the proof leads the court to disbelieve the debtor.'" *Id*. at 1288 (quoting *Heinold Commodities & Sec., Inc. v. Hunt (In re Hunt)*, 30 B.R. 425, 441 (M.D. Tenn. 1983)).

The evidence is clear and convincing that the Debtor indeed made the misrepresentations to Ms. Snow with the intent to deceive her and to fraudulently induce her to loan him $100,000.00. He and Tracy were just married and starting a life together. He was living with Tracy in her house, and they wanted to purchase this particular tract of land. Although Ms. Snow had visited him at work from time to time, he only started coming to visit her at her home more frequently in 2022 when she decided to sell her home. It was clear from the testimony that her decision to sell her home was the catalyst for more frequent visits from the Debtor and the discussions of the property he really wanted to buy. He even arranged for the realtor and assisted Ms. Snow in selling her home.

Ms. Snow testified that when the Debtor was trying to convince her to loan him the $100,000.00 she "was really not feeling well" and she would not have given him the money at all had she been her "normal self." However, the Debtor continued to pressure her, and she eventually agreed to loan him the money, believing that he had his money (or assets to liquidate) and just needed a little time to get everything together and she would be repaid in a short amount of time. The Debtor's statements to Ms. Snow made her believe it was urgent that he purchase the property right away or he would lose the opportunity to do so. In addition, he told her he would put her name on the property to guarantee she would be repaid. Ms. Snow's testimony

was both convincing and credible that the Debtor made the misrepresentations to deceive her and to induce her to loan him the $100,000.00.

In making these false statements the Debtor knew or should have known that the statements would induce Ms. Snow to loan him the $100,000.00.  Consistent with Ms. Snow believing the $100,000.00 was a loan and not a gift, Ms. Snow went to her bank and had a cashier's check issued in the amount of $100,000.00 made payable to "Joshua Holmes" dated June 6, 2022.  Also consistent with her understanding of the nature of the transaction, she had a notation placed on the cashier's check indicating the $100,000.00 was a loan.

From the evidence, it is clear to this Court that the Debtor knowingly made false representations to Ms. Snow that he just needed a short-term loan to purchase the land in Harrisburg and would be able to repay the money within a short time.  In the meantime, her name would be on the property so she did not need to worry about repayment.  None of these representations were true.  The Court finds that the Debtor knowingly and intentionally made the representations for the purpose of deceiving Ms. Snow to induce her to loan him the $100,000.00 without any intention or means to repay the money to her and knew his representations would induce her to make the loan.  The Debtor's unsupported assertions to the contrary do not overcome Ms. Snow's credible testimony.  His self-serving statements that the $100,000.00 was given to him as a gift or an early inheritance are not supported by the evidence.  His actions appear to the Court as so inconsistent with these statements that the Court finds his testimony to be without credibility.

The Court finds that Ms. Snow met her burden of proving that the Debtor made the misrepresentations deliberately to deceive her.

### *(4)  Did Ms. Snow justifiably rely on the false representations?*

The fourth element the Court must consider is whether Ms. Snow justifiably relied on the false representations.  "[J]ustifiable reliance is the standard applicable to a victim's conduct in cases of alleged misrepresentation."  *Field v. Mans*, 516 U.S. 59, 71–72 (1995) (quoting W. PROSSER, LAW OF TORTS § 108 (4th ed. 1971)).   A debtor is not required to make an investigation on her own unless she has "discovered something which should serve as a warning that [s]he is being deceived."  *Id.* at 71.  "Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases."  *Id.*  (quoting RESTATEMENT (SECOND) OF TORTS § 545A cmt. b (1976)).  The standard for showing justifiable reliance under Section 523(a)(2)(A) is fairly low.  *Guske v. Guske (In re Guske)*, 243 B.R. 359, 363 (B.A.P. 8th Cir. 2000) (citing *Sanford Inst. for Sav. v. Gallo*, 156 F.3d 71, 74 (1st Cir. 1998)).

 Ms. Snow was dealing with a family member, her nephew, someone she described as having a "close relationship" with after her son died.  She would visit him at work from time to time and take him snacks.  They would talk about things going on in their lives.  On two occasions the Debtor had mentioned the need for money, and she had volunteered to help him.  Both times she loaned him money, and he paid her back.

Ms. Snow trusted the Debtor with her own financial affairs and had even added him to her bank accounts.  She had no reason to believe he was deceiving her in saying how urgently he needed the money to purchase the property in Harrisburg or that he was getting his money together to purchase the property.  The way he was talking to her left her with the impression that he had the money, but just needed to get it together.

The Court finds nothing in the evidence to show there was anything to alert Ms. Snow that her reliance on his statements was not justified or that would put Ms. Snow on notice of the fraud being perpetrated against her, triggering a duty on her part to investigate.  There simply is nothing in the record to support a finding that Ms. Snow should have doubted the statements the Debtor was making to her.  She knew he was going to sell some property he owned with his ex-wife and that Tracy would be selling her property.  Ms. Snow needed the money from the sale of her home for retirement and had planned to move into an apartment, so the funds being unavailable for a short time in order to help the Debtor obtain the property he wanted was not an impediment to her plans.  Helping him buy the property seemed a logical step for her knowing that she would be getting the money back in a short amount of time, especially after he began talking to her about moving into the property with him and helping her with her medical needs.

Accordingly, the Court finds that Ms. Snow has met her burden of proving the fourth element that she justifiably relied on the Debtor's false representations in loaning him $100,000.00.

### *(5) Did the misrepresentations proximately cause Ms. Snow's damage?*

The fifth factor the Court must consider is whether the Debtor's false representations proximately caused Ms. Snow's damage.  In determining whether the false representations made by the Debtor proximately caused Ms. Snow's injury, the Court follows the lead of the United States Supreme Court, which relied on the Restatement (Second) of Torts to define the concept of fraud as it was understood in 1978 when Section 523(a)(2)(A) was added to the Bankruptcy Code.  *See Field*, 516 U.S. at 70.  The Restatement explains that proximate cause comprises two components: (1) causation in fact, and (2) legal causation.

Causation in fact is defined by the following rule: "The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss suffered by one who justifiably relies upon the truth of the matter misrepresented, if his reliance is a substantial factor in determining the course of conduct that results in his loss." RESTATEMENT (SECOND) OF TORTS § 546 (1976). S*ee also Smith v. Davenport (In re Davenport)*, 491 B.R. 911, 919 (Bankr. W.D. Mo. 2013). Comment a to Section 546 adds that the rule is concerned with the question of "whether the misrepresentation made by the defendant has caused the plaintiff's loss at all." RESTATEMENT (SECOND) OF TORTS § 546 cmt. a (1976).

The Restatement also defines legal causation as related to misrepresentation. Section 548A provides, "A fraudulent misrepresentation is a legal cause of pecuniary loss resulting from action or inaction in reliance upon it if, but only if, the loss might reasonably be expected to result from the reliance." RESTATEMENT (SECOND) OF TORTS § 548A (1976). S*ee also Davenport*, 491 B.R. at 919. Legal causation requires that the loss be reasonably expected to occur from the reliance and is a question of foreseeability. *Sharfarz v. Goguen (In re Goguen)*, 691 F.3d 62, 70 (1st Cir. 2012) (citing *Sys. Mgmt., Inc. v. Loiselle*, 303 F.3d 100, 104 (1st Cir. 2002)).

Consistent with Ms. Snow believing the $100,000.00 was a loan and not a gift, Ms. Snow went to her bank and had a cashier's check issued in the amount of $100,000.00 made payable to "Joshua Holmes" dated June 6, 2022, noting on the check itself that it was for a loan on land and a trailer. As stated above, Ms. Snow justifiably relied on the Debtor's false representations in loaning him the $100,000.00. Ms. Snow was adamant and consistent in her testimony that the

$100,000.00 was a loan and not a gift to the Debtor.  The evidence is overwhelming that the Debtor's misrepresentations led to Ms. Snow's actions in loaning the Debtor $100,000.00.[4]

The evidence also supports a finding that Ms. Snow has been damaged by loaning this money to the Debtor.  It is not disputed that Ms. Snow transferred $100,000.00 to the Debtor and is unlikely to be able to collect the funds in a short time, if at all.  The Debtor's fraudulent intent to take the money without any intention of repaying the loan has caused Ms. Snow damages in the amount of $100,000.00.  The resulting damages were not only reasonably expected to result from her reliance on the Debtor's false representations, but were certain to result.  The Court finds that Ms. Snow has met her burden of proving the fifth element.

For all the foregoing reasons, the Court finds that Ms. Snow's claim in the amount of $100,000.00 is nondischargeable as a debt obtained by false pretenses and false representations.

### (6)   *Actual Fraud*

The Court will now turn to actual fraud.  "The Bankruptcy Code has long prohibited debtors from discharging liabilities incurred on account of their fraud, embodying a basic policy animating the Code of affording relief only to an 'honest but unfortunate debtor.'"  *Cohen v. de la Cruz*, 523 U.S. 213, 217 (1998) (quoting *Grogan*, 498 U.S. at 287).  As stated earlier, the Supreme Court explained the cause of action for actual fraud under Section 523(a)(2)(A) stating:

> "Actual fraud" has two parts: actual and fraud.  The word "actual" has a simple meaning in the context of common-law fraud:  It denotes any fraud that "involve[es] moral turpitude or intentional wrong."  *Neal v. Clark*, 95 U.S. 704, 709, 24 L. Ed. 586 (1878).  "Actual" fraud stands in contrast to "implied" fraud or fraud "in law," which describe acts of deception that "may exist without the imputation of bad faith or immorality."  *Ibid.*  Thus, anything that counts as "fraud" and is done with wrongful intent is "actual fraud."

*Husky*, 578 U.S. at 360.

---

[4] Although the Debtor has raised the statute of frauds, it is clear to this Court that Ms. Snow did not intend it to take over a year for the Debtor to repay the $100,000.00 to her.

"Actual fraud, by definition, consists of any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another—something said, done or omitted with the design of perpetrating what is known to be a cheat or deception." *Moen*, 238 B.R. at 790–91 (quoting *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1293 (5th Cir. 1995)). "The concept of actual or positive fraud consists of something said, done, or omitted by a person with the design of perpetrating what he knows to be a cheat or deception." *Id.* at 791 (quoting *Stentz v. Stentz (In re Stentz)*, 197 B.R. 966, 981 (Bankr. D. Neb. 1996)).

The evidence is overwhelming to the Court that the Debtor made false representations to Ms. Snow deliberately and intentionally for the purpose of deceiving her at the time she made the loan to him. The evidence does not support a finding that Ms. Snow was making a gift of an early inheritance to the Debtor. The Debtor even testified that Ms. Snow told him if it did not work out with him, she would just stay in the apartment that she had rented in Jonesboro, and Ms. Snow needed the sale proceeds from her home to rely on during her retirement. This finding of a fraudulent intent is further supported by the Debtor's actions immediately after he received the $100,000.00 cashier's check from Ms. Snow.

After being told by 21st Mortgage that he would not be able to purchase the mobile home with the $100,000.00 showing up as a loan, the Debtor proceeded to make sure the $100,000.00 was shown as a gift, despite the fact it was not a gift. The Gift Letter purports to be a statement by Ms. Snow dated June 29, 2022, that she made a gift of $100,000.00 to Josh Holmes, her nephew, from her personal checking account. The Gift Letter introduced into evidence was, according to the Debtor, filled out completely by his wife Tracy, except for Ms. Snow's signature. The Debtor testified that he, personally, took the Gift Letter to Ms. Snow and witnessed her sign the Gift Letter. The Court does not believe the Debtor's testimony.

34

First, this Court believes Ms. Snow's testimony regarding the signature—she did not sign the Gift Letter, had not seen the Gift Letter until it was shown to her on the day of the trial, and she would not have signed the Gift Letter even if asked to do so because it was not true.  The $100,000.00 was a loan, not a gift.

Second, and most persuasive to a finding of actual fraud is the purported signature of Ms. Snow on the Gift Letter.  Three checks written on Ms. Snow's bank account were introduced into evidence.  The checks were dated November 28, 2022; December 29, 2022; and January 26, 2023, all in the amount of $610.00 and all with a notation on the memo line "house payment." (Pl.'s Ex. 15).  Ms. Snow acknowledged that the signatures on the three checks were her signatures.  The signatures on all three checks looked the same with distinctive characteristics. All three signatures on the checks are totally different in appearance than the signature purported to be Ms. Snow's signature on the Gift Letter.  The signature on the Gift Letter is not even close in appearance to Ms. Snow's signatures on the checks.  In addition, the distinctive characteristics of Ms. Snow's "M"  and "i" on the checks are not present on the Gift Letter.

The Debtor testified under oath and under penalty of perjury that he physically took the Gift Letter to Ms. Snow and witnessed her sign the Gift Letter.  The Court does not believe his testimony.  The evidence is clear and convincing that Ms. Snow did not sign the Gift Letter herself.

The Debtor's fraudulent intent is further demonstrated by the Debtor's actions in connection with the lawsuit filed against him by Ms. Snow.  Despite providing the Gift Letter to 21st Mortgage to obtain the mobile home loan, the Debtor agreed to the entry of a consent order stating he did owe Ms. Snow $100,000.00.  He then listed the debt on his schedules as an unsecured claim and represented to the trustee that the $100,000.00 was a loan, not a gift.

The false representations made to Ms. Snow were designed to trick her into making a $100,000.00 loan to the Debtor. The Debtor used the Gift Letter purportedly signed by Ms. Snow to obtain his loan to purchase the mobile home. The Debtor's actions coupled with his false representation that the $100,000.00 was a gift and not a loan involve a fraud of moral turpitude, an intentional wrong. The Court finds that these acts of trickery rise to the level of actual fraud sufficient to deny the Debtor's ability to discharge his $100,000.00 debt to Ms. Snow.

### B.  11 U.S.C. § 727(a)(4)

At trial, Ms. Snow argued that the Debtor's discharge should be denied pursuant to 11 U.S.C. § 727(a)(4)(A). This cause of action was not in the First Amended Complaint, but evidence relevant to this cause of action was introduced without objection and argued by both parties in their post-trial briefs. Whether this claim should be considered timely as a procedural matter is immaterial because, as discussed below, the claim must be denied due to Ms. Snow's failure to meet her burden of proof on all the requisite elements.

As courts have widely noted, denying a debtor's discharge is a "harsh remedy," and for that reason, courts must construe complaints objecting to discharge strictly in favor of the debtor. *Snyder v. Dykes (In re Dykes)*, 590 B.R. 904, 909 (B.A.P. 8th Cir. 2018) (citing *Korte v. I.R.S. (In re Korte)*, 262 B.R. 464, 471 (B.A.P. 8th Cir. 2001)), *aff'd*, 954 F.3d 1157 (8th Cir. 2020). "The reasons for denying a discharge . . . must be real and substantial, not merely technical and conjectural." *McDermott v. Petersen (In re Petersen)*, 564 B.R. 636, 645 (Bankr. D. Minn. 2017) (quoting *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir. 1987)). Ms. Snow has the burden of proving the elements of her cause of action "by a preponderance of the evidence" for the Debtor's discharge to be denied. *Dykes*, 590 B.R. at 909.

36

Under Section 727(a)(4)(A), a debtor's discharge will be denied if "the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account." 11 U.S.C. § 727(a)(4)(A). "Section 727(a)(4)(A) 'provides a harsh penalty for the debtor who deliberately secretes information from the court, the trustee, and other parties in interest in his case.'" *Korte*, 262 B.R. at 474 (quoting *Cepelak v. Sears (In re Sears)*, 246 B.R. 341, 347 (B.A.P. 8th Cir. 2000)). The debtor must provide "full and complete disclosure of any and all apparent interests of any kind." *Id*. (quoting *Fokkena v. Tripp (In re Tripp)*, 224 B.R. 95, 98 (Bankr. N.D. Iowa 1998)). "The debtor's 'petition, including schedules and statements, must be accurate and reliable, without the necessity of digging out and conducting independent examinations to get the facts.'" *Id.* (quoting *Sears*, 246 B.R. at 347).

To prevail under Section 727(a)(4)(A), Ms. Snow must prove the following elements: "(1) the debtor made the statement under oath; (2) the statement was false; (3) the statement was made with fraudulent intent; (4) the debtor knew the statement was false; and (5) the statement related materially to the debtor's bankruptcy." *Smith v. Cooper (In re Cooper)*, 399 B.R. 637, 646 (Bankr. E.D. Ark. 2009) (citing *Jacoway v. Mathis (In re Mathis)*, 258 B.R. 726, 735 (Bankr. W.D. Ark. 2000)). While Ms. Snow bears the burden of proof, once she "has introduced evidence that the [D]ebtor committed any of the prohibited acts, the [D]ebtor has the burden of coming forward with evidence to explain his conduct." *Id*. (citing *Ramsay v. Jones (In re Jones)*, 175 B.R. 994, 997 (Bankr. E.D. Ark. 1994)).

### *(1) Did the Debtor make false material statements under oath?*

For the first, second, and fifth elements under Section 727(a)(4)(A), the Court must determine whether the Debtor made a statement under oath, and if so, whether that statement was false and whether the statement related materially to the Debtor's bankruptcy case.

It is well-established that for purposes of Section 727(a)(4)(A), schedules and statements signed under penalty of perjury and a debtor's testimony given at the meeting of creditors constitute oaths. *Dantzler v. Zulpo (In re Zulpo)*, 592 B.R. 231, 251–52 (Bankr. E.D. Ark. 2018) (citing *Kaler v. Charles (In re Charles)*, 474 B.R. 680, 684 (B.A.P. 8th Cir. 2012)).

Statements are material if they bear "a relationship to the bankrupt's business transactions or estate, or concern[] the discovery of assets, business dealings, or the existence and disposition of his property." *Sears*, 246 B.R. at 347 (quoting *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir. 1984) (per curiam)).

Ms. Snow asserts that several statements made by the Debtor in his schedules satisfy these elements. More specifically, Ms. Snow alleges the following false oaths support the Debtor's denial of discharge:

(a) The Debtor's failure to list child support as income in response to Question No. 5 in his SOFA although he listed the income on his Schedule I;

(b) The Debtor's failure to list $13,000.00 received from the sale of his 2016 Dodge Ram as income in response to Question No. 5 in his SOFA although he did list the sale in his amended SOFA in response to Question No. 18;

(c) The Debtor's characterization of the transfer of a 2003 Jeep Wrangler in response to Question No. 18 on his SOFA as a sale for $3,000.00 when, in fact, the transfer involved the trade of the 2003 Jeep Wrangler for a 2009 Dodge Ram and not a $3,000.00 sale;

(d) The Debtor's failure to list a safe in his home on his Schedule B;

(e) The Debtor's failure to disclose the rental income he received from Ms. Snow when she was living with him;

(f)   The Debtor's failure to list transfers to his wife of one-half interest in the land and

one-half of the interest in the mobile home downpayment of $40,000.00; and

(g)   The Debtor's omission of eight transfers on his SOFA that were disclosed to the

trustee on a separate written note but not filed with the Court.

Here, there is no dispute that the statements were made and were made under oath.   The

statements were false and were material because they related directly to the existence and

disposition of the Debtor's property.   Therefore, Ms. Snow has established the first, second, and

fifth elements under Section 727(a)(4)(A).

### (2)   Did the Debtor make the false statements knowingly with fraudulent intent?

Under the third and fourth elements, Ms. Snow must prove the Debtor knew the

statements were false and made them with fraudulent intent.   *Cooper*, 399 B.R. at 646.   A

statement is made "knowingly" if the Debtor "acted deliberately and consciously."   *Zulpo*, 592

B.R. at 253 (citing *Merena v. Merena (In re Merena)*, 413 B.R. 792, 815–16 (Bankr. D. Mont.

2009)).   A plaintiff may establish fraudulent intent under Section 727(a)(4)(A) by circumstantial

evidence.   *Id.*   In addition, "statements made with reckless indifference to the truth are regarded

as intentionally false" under this provision.   *Korte*, 262 B.R. at 474 (quoting *Golden Star Tire,

Inc. v. Smith (In re Smith)*, 161 B.R. 989, 992 (Bankr. E.D. Ark. 1993)).

The Court finds Ms. Snow failed to prove the Debtor made the statements with fraudulent

intent.   The Court finds the Debtor did not deliberately or consciously make the false statements

with a fraudulent intent.   While the Debtor failed to list child support as income in response to

SOFA Question No. 5, he did disclose the income on Schedule I.   Similarly, the sale of the 2016

Dodge Ram and the transfer of the 2003 Jeep Wrangler were disclosed.   And while he did not list

the transfers to his wife of the land, he did list his interest in the land as being a one-half interest.

And, as to the mobile home, the Debtor's wife is a co-borrower on the loan so she would logically be included on the title.  Finally, although the Debtor did not list each of the transfers that began with the sale of the 2016 Dodge Ram and ended with the trading of the 2003 Jeep Wrangler for a 2009 Dodge Ram, he cooperated with the trustee and provided this information to the trustee as requested.

While his schedules could have been more complete, the assets and transfers were not concealed from the trustee or creditors in a way for this Court to find the Debtor did so with fraudulent intent.  Numerous details were on his schedules, including a substantial number of items that were on his property but owned by others.

The evidence shows that while some disclosures were inaccurate, they were not made with reckless indifference to the truth.  Rather, the evidence supports a finding of "an honest error or mere inaccuracy" which is "not a proper basis for denial of discharge."  *Zulpo*, 592 B.R. at 253 ("A debtor will not be denied discharge if a false statement is due to mere mistake or inadvertence . . . [and] an honest error or mere inaccuracy is not a proper basis for denial of discharge." (quoting *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1294–95 (10th Cir. 1997))).  The details in the schedules also show the Debtor's intent to be as accurate as possible to enable him to obtain a discharge and to discharge Ms. Snow's $100,000.00 claim.

Therefore, the Court finds that Ms. Snow failed to prove the third and fourth elements required under Section 727(a)(4)(A), and her cause of action under this provision must fail.

## V.  Conclusion

For the foregoing reasons, Ms. Snow is awarded a judgment in the amount of $100,000.00 against the Debtor and that judgment is nondischargeable as a debt obtained by false pretenses, false representations, and actual fraud pursuant to 11 U.S.C. § 523(a)(2)(A).

40

Ms. Snow's actions to deny the Debtor's discharge brought under 11 U.S.C. § 727(a)(4) and (a)(5) are dismissed; and

Ms. Snow's action brought under 11 U.S.C. § 548(a)(1)(B) was withdrawn at trial and is also dismissed.

A separate judgment will be entered accordingly.

IT IS SO ORDERED.

Phyllis M. Jones
United States Bankruptcy Judge
Dated:  01/16/2026

cc:     Forrest Stolzer, Esq.
        Mike DeLoache, Esq.
        Mai Snow, Plaintiff
        Joshua Darrell Holmes, Defendant
        Lance Owens, Trustee